UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| ROBERT A. HAMILTON and JOAN M. HAMILTON, | )<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | ) Case No. 1:15-CV-303 JD<br>) |
| UNITED STATES OF AMERICA, | )<br>) |
| Defendant. | ) |

## OPINION AND ORDER

Plaintiffs Robert and Joan Hamilton filed this action seeking a refund of federal income taxes. They argue that they are entitled to take large deductions for theft losses arising out of real estate investments they made in a development project that turned out to be fraudulent. They made part of those investments through a partnership that they jointly owned with another couple, and they made another investment directly, on their own behalf. Several years after the fraud came to light, the Hamiltons filed amended tax returns seeking a total theft-loss deduction of $464,472 for the year 2008, when they first learned of the fraud, and they also sought to carry that deduction back to 2005. This would result in refunds of $21,157 for 2008 and $76,714 for 2005. The Internal Revenue Service disallowed those deductions and refused to issue the requested refunds, precipitating this case.

The IRS has now moved for summary judgment, arguing that the Court lacks jurisdiction to the extent the Hamiltons seek deductions attributable to the partnership's losses, and that the remaining deductions could not have been properly taken in the years in question, so the Hamiltons are not entitled to any portion of the refunds they seek. The Hamiltons responded in opposition to that motion and also filed a cross-motion for partial summary judgment, arguing

that they are entitled to the refunds attributable to the partnership. For the following reasons, the Court grants the IRS' motion and denies the Hamiltons' motion.

## I. FACTUAL BACKGROUND

In 2006, plaintiffs Robert and Joan Hamilton were approached with an investment opportunity in a real estate development project in North Carolina known as the Grandfather Vista Development. The investment was portrayed as the means by which the developers were financing the development. For $500,000, investors could purchase a 10-acre lot within the development site from the developers. They would also simultaneously execute a buy-back agreement effective one year after the date of purchase, by which the developers would repurchase the lot at a price of $625,000. The developers personally guaranteed the buy-back agreements, and apparently represented to buyers that they had over $100 million in net worth, meaning they portrayed the investment as nearly risk-free.[1] In addition, the buyers would not need to put substantial amounts of cash into the investment; instead, they would finance the investment through bank loans secured by the lots they were purchasing. The developers also agreed to pay the interest on those loans over the one-year period they would be outstanding. Thus, for a small down payment, the investors believed they would receive large, guaranteed returns after one year. As the Hamiltons explain it, they "understood that in exchange for using [their] credit to procure loans from pre-arranged banks, [they] would be repaid within a year with a significant return." [DE 29 ¶ 3].

The Hamiltons took part in the investment, and purchased one of the 10-acre lots for $500,000. They made a $25,000 down payment, and financed the rest through a bank, which disbursed the proceeds to the developers. At closing, the developers also paid the Hamiltons

---

[1] It is unclear how the developers explained their willingness to pay a twenty-five percent interest rate if they had such substantial assets to offer as security.

$38,000 to pay for the first year's interest on the loan. The Hamiltons were unconcerned with which particular lot they received, as none of the 10-acre parcels could be developed on their own—their value was that they were part of the greater development project and that they came with buy-back agreements that promised significant returns. The lot the Hamiltons received was referred to as Lot 86.

A short time after that transaction closed, the Hamiltons purchased a second, smaller parcel in the development. This lot was represented to be a retail lot that would be developed after the commercial development was completed. This time, the Hamiltons invested through a company named H-Cubed Enterprises, LLC. The two members of that company were RJH of Indiana, LLC, which the Hamiltons owned, and HomeHelper Enterprises, LLC, which was owned by their in-laws, Gregory and Cynthia Hellmann. H-Cubed Enterprises purchased this lot, known as Lot 135, for $275,000. This entire amount was financed, so they did not pay anything at closing, but they signed notes personally guaranteeing the loan.

As it turned out, those investments were indeed too good to be true. When it came time to close on the buy-back agreements, the developer failed to follow through. The developer never actually developed the property either, so the lots, which could not be developed individually, ended up being worth very little. Thus, the Hamiltons were left with large loans in their names, secured by property of little value. They state that they discovered the fraudulent nature of the project in 2008. In that same year, the state took action to shut down the Grandfather Vista development and another development in which some of the same developers were involved. Around that same time, the Hamiltons began joining lawsuits that sought recovery for these

3

investments from various parties.[2] On December 16, 2008, they filed suit along with other purchasers of the 10-acre lots against numerous individuals and entities, including the developers and the banks that financed the loans. In 2009, they joined another lawsuit related to their purchase of Lot 135, and they also joined at least two other adversary proceedings in bankruptcy proceedings against some of the developers. Those various suits continued for several years. Ultimately, however, the Hamiltons filed bankruptcy, through which they discharged their loan obligations arising out of these investments. The lender as to Lot 86 released its security interest in that property, so the Hamiltons now own it outright, while the Hamiltons transferred their interest in Lot 135 to the Hellmanns.

In 2011, the Hamiltons met with an accountant to address the tax implications of these investments and losses. They ended up filing amended tax returns for 2008, claiming that these losses constituted theft losses that could be deducted against their income in that year. For the amount of the deduction, they invoked a Revenue Procedure promulgated by the IRS applicable to losses from certain Ponzi schemes. They thus calculated their total investments into the properties (including the amounts that they borrowed but never had to pay back) and claimed 75% of those amounts as theft-loss deductions. That led to deductions in the amount of $361,347 relative to Lot 86, plus another $103,125 for their share of H-Cubed Enterprises' losses from Lot 135. Those partnership losses were different from what the Hamiltons and H-Cubed Enterprises had reported on their initial respective returns, and they filed amended returns to reflect those changes, but they did not file an administrative adjustment request relative to those changes, as discussed further below.

---

[2] They had also previously sued the developers in early 2008 in connection with landscaping obligations at Lot 135, and they settled that matter for $45,000, which they split equally with the Hellmanns.

Adding those deductions to the Hamiltons' return for 2008 would have reduced their tax liability for that year by $21,157, so they sought a refund of that amount. They also sought to carry those deductions back to their 2005 returns, which would have reduced their tax liability for that year by another $76,714, for which they also sought a refund. However, the IRS disallowed those deductions and denied their claim for refunds. Accordingly, the Hamiltons filed this action seeking those refunds.

## II. STANDARD OF REVIEW

Summary judgment is proper when the movant shows that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one identified by the substantive law as affecting the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" exists with respect to any material fact when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. Where a factual record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial, and summary judgment should be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *Bank of Ariz. v. Cities Servs. Co.*, 391 U.S. 253, 289 (1968)). In determining whether a genuine issue of material fact exists, this Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in that party's favor. *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008); *King v. Preferred Tech. Grp.*, 166 F.3d 887, 890 (7th Cir. 1999). Finally, the fact that the parties have each moved for summary judgment does not change the standard of review; cross-motions are treated separately under the standards applicable to each. *McKinney v. Cadleway Props., Inc.*, 548 F.3d 496, 504 n.4 (7th Cir. 2008).

## III. DISCUSSION

The IRS moved for summary judgment in full. First, the IRS argues that the Court lacks subject matter jurisdiction over the Hamiltons' claims to the extent their deductions are based on H-Cubed Enterprises' losses, as they did not fulfill the procedural prerequisites to confer jurisdiction on district courts over refund suits for partnership items. As to the remainder of the Hamiltons' claims, which arise out of their investment in Lot 86, the IRS argues that, even assuming the Hamiltons are eligible to take theft-loss deductions for those investments,[3] 2008 could not have been the proper year to take those deductions. That would mean that those deductions could not have been carried back to 2005, either. The Hamiltons responded in opposition to that motion, and (even though the deadline to file dispositive motions had passed weeks earlier) also filed a cross-motion for partial summary judgment. In their cross-motion, the Hamiltons argue that the Court not only has jurisdiction as to the partnership deductions, they are entitled to refunds from those deductions as a matter of law because the IRS did not reject the partnership's amended return. The Court first addresses its jurisdiction over the partnership deductions, after which it addresses the remaining claims on their merits.

### A.      Partnership Deductions

The IRS first argues that the Court lacks subject matter jurisdiction to the extent the Hamiltons seek a refund based on losses attributable to the partnership.[4] Those losses arise out of the purchase of Lot 135, which was made through H-Cubed Enterprises. H-Cubed Enterprises claimed a theft-loss deduction of $206,250 in its amended return. The Hamiltons, as half-owners

---

[3] The IRS believes otherwise, but does not seek summary judgment on that ground.
[4] In the tax context, the term "partnership" includes entities like LLCs that are not taxed at the entity level.

of H-Cubed Enterprises, claimed half of that amount as a theft-loss deduction in their amended return, and that deduction forms part of their claim for a refund.

Partnerships pose unique issues as to federal income taxes, as they do not pay taxes themselves. Instead, they "must file annual reports of the partners' distributive shares of income, gains, deductions, and credit; the partners are taxed in their individual capacities based on these calculations." *Kaplan v. United States*, 133 F.3d 469, 471 (7th Cir. 1998). In response to the problems posed by the taxation of partnership activities, Congress enacted the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), 26 U.S.C. §§ 6221–33. "Through TEFRA, Congress sought to ensure equal treatment of partners by uniformly adjusting partners' tax liabilities and channeling any challenges to these adjustments into a single, unified proceeding." *Kaplan*, 133 F.3d at 469. "This system has the additional advantage of abating the administrative burden that would be wrought by multiple, duplicative audits and lawsuits involving numerous partners in a single partnership." *Id.*

One method by which TEFRA accomplishes those goals is by limiting the jurisdiction of district courts to hear taxpayer actions brought for refunds attributable to partnership items, which ensures that the IRS first has the opportunity to address those matters at the partnership level. *Acute Care Specialists II v. United States*, 727 F.3d 802, 806, n.1 (7th Cir. 2013); *Kaplan*, 133 F.3d at 473. Pursuant to 26 U.S.C. § 7422(h), "No action may be brought for a refund attributable to partnership items . . . except as provided in section 6228(b) or section 6230(c)." The term "partnership items" includes a "partner's proportionate share of the partnership's income and deductible losses." *Kaplan*, 133 F.3d at 473; *see* 26 U.S.C. § 6231(a)(3); 26 C.F.R. § 301.6231(a)(3)-1(a)(1)(i). To file a refund action based on a partnership item, a taxpayer bears the burden of establishing that one of the two exceptions identified in § 7422(h) is present. The

7

latter exception, under § 6230(c), allows a partner to seek a refund based on a computational error.[5] 26 U.S.C. § 6230(c); *Kaplan*, 133 F.3d at 473. The former exception, under § 6228(b), allows a partner to seek a refund if the partner's administrative adjustment request (AAR) is denied. 26 U.S.C. § 6228(b); *Kaplan*, 133 F.3d at 473. As relevant here, an AAR is the process that a partnership or a partner must use if they wish to amend the reporting of partnership items relative to a previous return. *United States v. Stewart*, 663 F. App'x 336, 338 (5th Cir. 2016) ("In order for partnerships or partners to properly amend an income tax return, they must file an Administrative Adjustment Request . . . ."), *amended on denial of rehearing*, 671 F. App'x 937; *Samueli v. C.I.R.*, 132 T.C. 336, 341 (T.C. 2009) ("An AAR must be filed in accordance with section 6227 for a partner to change the treatment of a partnership item on the partner's return.").

There is no question here that the theft-loss deduction the Hamiltons seek through H-Cubed Enterprises' investment is a partnership item, as they are seeking their proportionate share of H-Cubed Enterprises' deductible losses. Accordingly, the Hamiltons must show that one of the two exceptions in § 7422(h) is present. However, they make no attempt to do so. Instead, they argue first that their taxes would be the same whether these were partnership losses or individual losses. They also argue that they are entitled to seek a refund without having filed an AAR because the IRS did not reject H-Cubed Enterprises' amended return that reflected the losses at issue. The Hamiltons make no attempt to ground these arguments in the text of the statute, though. They do not claim that the IRS simply made a computational error, so as to invoke the exception as to § 6230(c). They also admit that they did not file an AAR, as would be required for the exception as to § 6228(b) to apply. They argue that they should not have had to

---

[5] This section also allows a partner to seek a refund for an overpayment in light of a final partnership administrative adjustment, § 6230(c)(1)(B), but no such proceeding took place here.

file an AAR for the IRS to sustain their deduction in the first place, but that argument would only go to the merits of their claim; it cannot alter the statute's requirement that they file an AAR in order for a district court to have jurisdiction to adjudicate that claim.

The Fifth Circuit recently addressed a similar situation in *Rigas v. United States*, 486 F. App'x 491 (5th Cir. 2012). There, a partnership received a substantial payment, which it reported in its initial return as ordinary income. The taxpayers accordingly reported their distributive share of that ordinary income in their individual return. The partnership later filed an amended return in which it re-characterized the payment as a long-term capital gain, which would have been taxed at a lower rate. The taxpayers accordingly filed an amended return of their own in which they re-characterized their share as a long-term capital gain, consistent with the partnership's amended return, and they sought the substantial tax refund that would have resulted from that change. The IRS disallowed the taxpayers' claim (even though it paid refunds to other partners who made claims based on the same amended partnership return), so the taxpayers filed a refund action in a district court.

However, the Fifth Circuit held that there was no jurisdiction over that aspect of their claim. *Rigas*, 486 F. App'x at 500. The characterization of the income as ordinary income versus capital gains constituted a partnership item, so the jurisdictional bar in § 7422(h) applied.[6] *Id.* at 502. The taxpayers had not filed an AAR to amend their return, nor did they allege a computational error, so neither exception to § 7422(h) was present. Accordingly, even though the taxpayers were only asking for their return to be treated consistent with the partnership's amended return, and with the amended returns of the other partners who received refunds, the

---

[6] The court held that a different aspect of the taxpayers' claim was not a partnership item, and was thus not subject to § 7422(h), *Rigas*, 486 F. App'x at 500, but the Hamiltons do not attempt to raise a similar claim here.

court lacked jurisdiction over their claim under § 7422(h).[7] *Id.* The same analysis applies here. The Hamiltons did not file an AAR with their amended return, and do not assert a computational error, so even though they only ask to treat their individual return consistent with the amended return filed by H-Cubed Enterprises, the Court does not have jurisdiction over this aspect of their claim.

Finally, in their reply brief in support of their cross-motion for summary judgment, which is effectively a sur-reply to the IRS' motion, the Hamiltons argue for the first time that H-Cubed Enterprises' amended return was functionally equivalent to an AAR, as it "substantially complied" with the requirements for such a request. However, besides being waived for having been raised for the first time in a reply (or sur-reply), this argument fails on its merits. An AAR filed by a *partnership* does not satisfy the exception to § 7422(h), which applies only where the IRS has rejected an AAR filed by a *partner* under "section 6228(b)." 26 U.S.C. § 7422(h); *see* § 6228(b) (pertaining only to requests made by partners under § 6227(d)); § 6228(a) (pertaining to requests made by a tax matters partner on behalf of a partnership under § 6227(c)). Thus, an AAR filed by H-Cubed Enterprises would not give rise to jurisdiction in this action. In addition, the Hamiltons' argument misunderstands the effect of the IRS' failure to reject H-Cubed Enterprises' amended return. When a partnership files an AAR, the IRS has the option to "take no action on the request," § 6227(c)(2)(iii), in which case the partnership must file a "petition for an adjustment" in federal court within two years after the date of the AAR, § 6228(a)(1), (a)(2). Thus, the fact that the IRS did not reject H-Cubed Enterprises' amended return does not mean that the IRS accepted the return or conceded the validity of the deductions it claimed.

---

[7] The IRS later recovered the amounts paid to some of the other partners in a separate proceeding. *United States v. Stewart*, 663 F. App'x 336 (5th Cir. 2016).

For those reasons, the Court finds that it lacks subject matter jurisdiction over the Hamiltons' claims to the extent they seek a refund for losses attributable to H-Cubed Enterprises, based on its purchase of Lot 135.[8] Their claims are therefore dismissed without prejudice to that extent, and their cross-motion for summary judgment is denied.

**B.** **Remaining Deductions**

The Court next considers the Hamiltons' request for a refund based on the remaining deductions, arising out of their investment in Lot 86. Because they made that investment directly, not through a partnership, the jurisdictional hurdles just discussed do not apply to this aspect of their claims, so the Court has jurisdiction under 28 U.S.C. § 1346(a)(1) to evaluate the Hamiltons' request for a refund based on their losses from Lot 86. The Hamiltons seek refunds for both 2005 and 2008, but their claim as to 2005 relies entirely on carrying back the deduction from 2008, so the only question is whether the Hamiltons were entitled to take the theft-loss deduction in their 2008 return. In seeking summary judgment, the IRS argues that 2008 could not have been the proper year to deduct the claimed losses.

Section 165(a) allows a taxpayer to deduct "any loss sustained during the taxable year and not compensated for by insurance or otherwise." 26 U.S.C. § 165(a). The statute further states that "any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers such loss." § 165(e). The regulations provide further clarification on that point:

> A loss arising from theft shall be treated under section 165(a) as sustained during the taxable year in which the taxpayer discovers the loss. . . . However, if in the year of discovery there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, see paragraph (d) of § 1.165–1.

---

[8] Even if jurisdiction did exist over this aspect of the claims, they would fail on their merits for the same reasons as the deductions for Lot 86.

26 C.F.R. § 1.165-8(a)(2). In turn, section 1.165-1(d) states:

> [I]f in the year of discovery there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, no portion of the loss with respect to which reimbursement may be received is sustained, for purposes of section 165, until the taxable year in which it can be ascertained with reasonable certainty whether or not such reimbursement will be received.

26 C.F.R. § 1.165-1(d)(3). A plaintiff seeking a deduction on this ground bears the burden of proving that the loss was suffered and in what year it occurred. *Boehm v. C.I.R.*, 326 U.S. 287, 294 (1945); *Vincentini v. C.I.R.*, 429 F. App'x 560, 564 (6th Cir. 2011); *Howard v. United States*, 497 F.2d 1270, 1272 n.4 (7th Cir. 1974).

Rather than attempting to prove directly that they both discovered the loss and had no reasonable prospect of recovery in 2008, the Hamiltons attempt to invoke a Revenue Procedure that the IRS developed for handling losses from certain Ponzi schemes. Recognizing the difficulties in determining when theft losses can be taken for investments lost in a Ponzi scheme, Revenue Procedure 2009-20 established an optional safe-harbor procedure that allows "qualified investors" to take a theft-loss deduction based on a "qualified loss" from a "qualified investment." Rev. Proc. 2009-20 §§ 2, 5. This procedure generally allows such an investor to take a theft-loss deduction in the year that criminal charges are brought for the fraudulent scheme, and permits a deduction in the amount of seventy-five percent of the investment if the investor is seeking recovery from third parties, or ninety-five percent of the investment if the investor is not seeking recovery from third parties. Rev. Proc. 2009-20 § 5.01, .02. The Hamiltons argue that they followed this procedure by taking a deduction for seventy-five percent of their investment.

However, the Hamiltons entirely assume away the question of whether they are entitled to utilize this procedure in the first place. Again, as taxpayers seeking a deduction, the Hamiltons have the burden of submitting evidence showing that they are entitled to that deduction; it is not

12

enough for their claim to have been reasonable, they must prove that it was correct. *See Greenberger v. United States*, No. 1:14-cv-1041, 2015 WL 4076976, at *11 (N.D. Ohio June 19, 2015) (holding that the plaintiffs could not rely on Revenue Procedure 2009-20 because they failed to show that they were a "qualified investor" who suffered a "qualified loss" as defined under that procedure). Revenue Procedure 2009-20 is not universally applicable to any theft losses. As just noted, it applies only to a "qualified loss" from a "qualified investment." Rev. Proc. 2009-20 § 4.02, .06. The Hamiltons must therefore show that they met those requirements.

First, a "qualified loss" is "a loss resulting from a specified fraudulent arrangement in which, as a result of the conduct that caused the loss[,] . . the lead figure . . . was charged by indictment or information . . . under state or federal law with the commission of fraud [or] embezzlement" or "was the subject of a state or federal criminal complaint" alleging such a crime. Rev. Proc. 2009-20 § 4.02. Here, the Hamiltons do not provide any evidence that criminal charges were brought as a result of the conduct that caused their loss. Mr. Hamilton stated in his affidavit that "numerous actions were taken in 2008 by state authorities that either shut down the Grandfather Vista Project or related project, the Villages of Penland," [DE 29 ¶ 13],[9] but that falls short of establishing that criminal charges were brought relative to the conduct that caused their loss, as required by the Revenue Procedure. Perhaps conceding that point, the Hamiltons note in their statement of facts (though not in their argument, which does not address this requirement) that a subsequent Revenue Procedure stated that this requirement could also be met when civil or administrative proceedings are initiated. Rev. Proc. 2011-58 § 4.01 (adding a third

---

[9] Mr. Hamilton's affidavit also attached several news articles he printed from the internet, but those hearsay materials have no evidentiary value, *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997), and in any event, they do not show that any charges were brought relative to the Hamiltons' investment; they mention only a separate development project.

subpart to Rev. Proc. 2009-20 § 4.02). However, that exception would only apply when the "death of the lead figure precludes a charge by indictment, information, or criminal complaint." *Id.* (adding Rev. Proc. 2009-20 § 4.02(3)(b)). The Hamiltons do not suggest that anyone's death precluded criminal charges relative to their investment, so they cannot invoke this exception. Accordingly, the Hamiltons have not provided any evidence showing that they suffered a "qualified loss," as required to invoke Revenue Procedure 2009-20.

Second, Revenue Procedure 2009-20 applies only to a "qualified investment," and states that a qualified investment "does not include" any "[a]mounts borrowed from the responsible group and invested in the specified fraudulent arrangement, to the extent the borrowed amounts were not repaid at the time the theft was discovered." Rev. Proc. 2009-20 § 4.06(2)(A). Here, the vast majority of the Hamiltons' investment was borrowed and was not repaid, so they would have to show that they did not borrow those amounts "from the responsible group"—in other words, that the bank was not part of the fraud. However, they do not address this requirement at all, and thus fail to meet this requirement either. Accordingly, the Hamiltons have failed to meet their burden of showing that they are entitled to rely on Revenue Procedure 2009-20 to claim their theft-loss deduction in 2008.

Without being able to rely on the safe-harbor under that Revenue Procedure, the Hamiltons must establish that it could "be ascertained with reasonable certainty" in 2008 that they would not receive reimbursements for the amounts in question, in order to claim them as theft-loss deductions in that year. 26 C.F.R. § 1.165-1(d)(3); *Adkins v. United States*, 856 F.3d 914, 917 (Fed. Cir. 2017) ("[T]he proper year in which to claim a loss is the first year in which no reasonable prospect of recovery exists anymore, starting with the year of discovery."). "Good-faith efforts to recover losses—such as lawsuits and arbitration—will tend to push the claim year

later than the year of discovery by creating a probability of recovery." *Adkins*, 856 F.3d at 918; *see also Jeppsen v. C.I.R.*, 128 F.3d 1410, 1414 (10th Cir. 1997) ("[E]ven after a theft loss is discovered, if a claim for reimbursement exists during the year of the loss with respect to which there is a reasonable prospect of recovery, then a theft loss is treated as 'sustained' only when 'it can be ascertained with reasonable certainty whether or not such reimbursement for the loss will be obtained." (quoting 26 C.F.R. § 1.165-1(d)(2)(i), 1.165-1(d)(3))).

The Hamiltons filed suit in December 2008 against developers and banks involved in their purchase of Lot 86, and they continued to pursue that and other actions for several years. The pendency of such actions would not necessarily preclude a finding that they nonetheless had no reasonable prospect of recovery, *see Adkins*, 856 F.3d at 919–20, but the Hamiltons make no attempt to show that their suits offered no reasonable prospect of recovery. Mr. Hamilton states in his affidavit that, "[w]hile hopeful for some recovery, I could not determine if any reasonable prospect of recovery against any party existed." [DE 29 ¶ 14]. As multiple courts have held, though, "in a year where the prospect of recovery is simply unknowable, a theft-loss deduction under section 165 is inappropriate." *Vincentini*, 429 F. App'x at 654; *Jeppsen*, 128 F.3d at 1418 ("[I]f [the taxpayer's] prospect of recovery was simply unknowable as of December 31, 1987, then [he] would not be entitled to take the theft loss deduction in 1987."). Thus, without evidence that, as of 2008, their claims had no reasonable prospect of success or would not lead to a recovery,[10] the Hamiltons have not shown that they were entitled to take a theft-loss deduction in that year.

---

[10] The prospect of collecting a judgment from the developers themselves may have been remote, but the Hamiltons also asserted claims against the bank and contended that they did not have to repay the loan. [DE 24-1]; *see Fazzari v. Infinity Partners, LLC*, 762 S.E.2d 237 (N.C. Ct. App. 2014). If successful in that argument, their actual losses would have been much less than the theft-losses they now claim, given the comparatively small amount of cash they invested.

Accordingly, the Court finds that the Hamiltons were not entitled to take the theft-loss deductions at issue in 2008, meaning they were not entitled to carry them back to 2005, either. They are therefore not entitled to the refunds they seek for those years, so the Court grants the IRS' motion for summary judgment.

## IV. CONCLUSION

For those reasons, the Court GRANTS the United States' motion for summary judgment [DE 23] and DENIES the Hamiltons' cross-motion for summary judgment [DE 27]. The Hamiltons' claims are dismissed without prejudice for lack of jurisdiction to the extent they seek a deduction for partnership losses attributable to H-Cubed Enterprises. The Court grants judgment in favor of the United States as to the remainder of the claims. The Clerk is DIRECTED to enter judgment accordingly.

SO ORDERED.

ENTERED: September 5, 2017

/s/ JON E. DEGUILIO
Judge
United States District Court